**IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
BRYSON CITY DIVISION**

**CIVIL NO. 2:07CV11**

| | |
|---|---|
| **BARBARA A. BRUFF** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **Vs.** ) | **MEMORANDUM** |
| _____) | **AND ORDER** |
| **MICHAEL J. ASTRUE, Commissioner** ) | |
| **of Social Security Administration,** ) | |
| ) | |
| **Defendant.** ) | |
| _____) | |

**THIS MATTER** is before the Court on the parties' cross motions for

summary judgment. For the reasons stated herein, the Defendant's motion

is granted and the Plaintiff's motion is denied.

## I. STANDARD OF REVIEW

This Court does not conduct a *de novo* review of the decision of the

Administrative Law Judge (ALJ). In fact, under the statutory scheme of the

Social Security Act, the reviewing court "must uphold the factual findings of

the Secretary if they are supported by substantial evidence and were

reached through application of the correct legal standard." ***Craig v.***

***Chater*, 76 F.3d 585, 589 (4ᵗʰ Cir. 1996); 42 U.S.C. § 405(g) (1988).**

Substantial evidence is defined as that which "'a reasonable mind might

accept as adequate to support a conclusion.'" ***Id.* (quoting *Richardson v.***

***Perales*, 402 U.S. 389, 401(1971) (other citations omitted)); *Pierce v.***

***Underwood*, 487 U.S. 552 (1988).** "'It consists of more than a mere

scintilla of evidence but may be somewhat less than a preponderance.'"

***Id.* (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4ᵗʰ Cir. 1966));**

***Shively v. Heckler*, 739 F.2d 987, 989 (4ᵗʰ Cir. 1984).** If there is sufficient

evidence to withstand a motion for a directed verdict had the case been

before a jury, then the evidence is substantial and the ALJ's decision may

not be overturned. ***Id.*** "It is not our place either to weigh the evidence or

to substitute our judgment for that of the Secretary if that decision was

supported by substantial evidence." ***Hunter v. Sullivan*, 993 F.2d 31, 34**

**(4ᵗʰ Cir. 1992) (citing *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4ᵗʰ Cir.**

**1990)).** Thus, the issue for resolution here "is not whether [Plaintiff] is

disabled, but whether the ALJ's finding that she is not disabled is

supported by substantial evidence and was reached based upon a correct

application of the relevant law." ***Craig, supra.***

Each party has moved for summary judgment, claiming they are entitled to judgment as a matter of law.  Summary judgment is appropriate if there is no genuine issue of material fact and judgment for the moving party is warranted as a matter of law.  **Fed. R. Civ. P. 56(c).**  A genuine issue exists if a reasonable jury considering the evidence could return a verdict for the nonmoving party.  ***Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).**

Where the parties have cross-moved for summary judgment, the Court will consider each motion separately.  Thus, in considering the Plaintiff's motion, Plaintiff as the moving party has an initial burden to show a lack of evidence to support Defendant's case.  ***Shaw, supra* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).**  If this showing is made, the burden then shifts to the Defendant who must convince the Court that a triable issue does exist.  ***Id.***  Such an issue will be shown "if the evidence is such that a reasonable jury could return a verdict for the [Plaintiff]."  ***Id.***  A "mere scintilla of evidence" is not sufficient to defeat summary judgment.  ***Id.***  After consideration of the Plaintiff's motion, the

same procedure is used in connection with Defendant's motion for summary judgment.

Thus, in considering the facts of the case for purposes of these cross-motions, the Court will view the pleadings and material presented in the light most favorable to the nonmoving party. ***Matsushita Elec. Indus. Co. v. Zenith Radio Corp.***, **475 U.S. 574 (1986).** Thus, in order to receive disability insurance benefits, Plaintiff must show that she was disabled on or prior to December 31, 2006, the date on which she last met the insured status under the Social Security Act.[1] ***Kasey v. Sullivan***, **3 F.3d 75, 77 n.3 (4th Cir. 1993); 42 U.S.C. § 423(a)(1)(A), (c)(1); 20 C.F.R. § 404.131;** ***Wilkins v. Secretary***, **925 F.2d 769, 771 n.2 (4th Cir. 1991);** ***Fagg v. Chater***, **106 F.3d 390 (table), 1997 WL 39146 *1 (4th Cir. 1997).** Moreover, the fact that a condition which had its onset prior to that date

---

[1] Plaintiff contends that the ALJ erroneously determined that the last date she met insured status was December 31, 2005, when the record reflects the date to be December 31, 2006. ***See* Transcript of Proceedings, filed August 13, 2007, at 23,** *but see, id*. **at 64 ("DIS DLI: 12/06").** Inasmuch as the record reflects the latter date to be correct, the Court sustains the objection and the Court so finds. However, having determined that the Plaintiff is not disabled, the Court further finds that the ALJ's error was harmless.

later rendered Plaintiff disabled is not sufficient to warrant an award of benefits. **Roberts v. Schweiker, 667 F.2d 1143, 1144 (4th Cir. 1981).**

## II.  PROCEDURAL HISTORY

The Plaintiff filed initial applications for disability insurance benefits and supplemental security income on July 26, 2003, alleging an onset of disability of May 25, 2003. **Transcript of Proceedings ("Tr."), filed August 13, 2007, at 71, 301.** Her claims were denied initially and upon reconsideration. **Id. at 54, 57, 295.** She timely filed a request for a hearing before an Administrative Law Judge (ALJ) and such hearing was held on February 14, 2006. **Id. at 51.** The ALJ issued an unfavorable decision on August 22, 2006, and the Plaintiff requested Appeals Council review. **Id. at 18.** The Appeals Council rejected her request for review on April 13, 2007. **Id. at 5**. On June 12, 2007, the Plaintiff filed this action. Following the Defendant's answer on August 13, 2007, the parties filed their respective motions for summary judgment on October 15, 2007, and November 9, 2007.

### III.  FINDINGS OF FACT

At the hearing before the ALJ on February 14, 2006, the Plaintiff, appearing with counsel, testified she was born June 5, 1969, and completed high school.  *Id*. **at 317.**  She testified she last worked as an electrician's helper in May 2003 where her duties were mainly cleaning up after the jobs, carrying ladders, installing fixtures and light bulbs.  *Id*. **at 321, 334.**  She stated that she left that job when the pain in her back resulted in her being unable to stand for more than 15 or 20 minutes, bend over, use a ladder, or pull wire.  *Id*. **at 319-20.**  She also testified she had work experience as a restaurant manager in different fast food and dining restaurants.  *Id*. **at 323-24, 328-29.**  Even though her duties were different at each establishment, she was, for the most part, responsible for the wait staff and kitchen staff, prepared employees' schedules, made hiring and termination decisions, prepared reports using a computer, made bank deposits, and waited tables if needed.  *Id*. **at 324-25, 336.**  She left the restaurant business after having "a bout of bipolar" where she experienced periods of depression, mania and suicidal ideations.  *Id*. **at 325-26.**  She also has work experience in a photo shop where she developed pictures using a machine and also made enlargements of photographs.  *Id*. **at 340.**

The Plaintiff testified she left that job because the owner was closing the store. *Id*. Before moving to North Carolina, she worked at various pharmacies in Michigan as a pharmacy technician. **Id. at 341.** This job required her to count and stock the inventory, which included lifting no more than 20 pounds, and she also operated the cash register. **Id. at 342-43.** She also worked for K-Mart in 1991, starting out as a cashier and then in the shipping and receiving area where she unloaded trucks, which required her to lift up to 100 pounds. **Id. at 344.**

The Plaintiff testified that she was arrested in 1998 or 1999 in Georgia for possession of cocaine, marijuana and prescription drugs. **Id. at 327, 337-38.** She was placed on probation for five years. **Id. at 327.** When the ALJ asked Plaintiff why she could not return to her job as a pharmacy technician, the Plaintiff testified that she is unable to stand for long periods of time due to the pain she suffers in her lower back which radiates down the back of her left leg. **Id. at 345-47.** She testified she takes Ultracet for pain and Aleve for inflammation. **Id. at 348, 350.** She stated that when her pain becomes a five on a scale of one to ten, ten being the most severe pain, she will take an Aleve; when her pain reaches level six, she takes the Ultracet. *Id*. She also takes Aciphex for her acid

reflux condition. ***Id*. at 348-49.**   The Plaintiff testified that her family physician and an orthopedist had recommended she defer surgery until her condition worsened. ***Id*. at 351.**

The Plaintiff testified that as much as three times a day she has to lay back in a recliner due to the pain in her back; that she cannot lift more than 20 pounds; that she has problems putting her socks on because of the pain and stiffness in her back when she bends over; that she tries to do the housework, but can only stand 15 to 20 minutes at a time; that she does the grocery shopping, but needs assistance at times when the pain prevents her from walking through the store. ***Id*. at 353-55.**  She received mental health treatment at Smoky Mountain Mental Health until August 2003 at which time her therapist told her to return on an "as needed" basis. ***Id*. at 355-56.**  The Zoloft she takes helps her with the bipolar condition and depression. ***Id*. at 356.**

Through questioning from her attorney, the Plaintiff testified that she cannot work because of the pain in her back and the resulting depression her condition causes. ***Id*. at 359.**  In addition to laying down, the Plaintiff also testified that she uses a heating pad to alleviate the pain in her back; she experiences night sweats which interrupt her sleep; that she has

difficulty doing the laundry and vacuuming because it is very painful to bend over for any length of time; that she used to play golf and softball and cannot participate in those activities now due to the back pain she suffers. *Id*. **at 360-62.**

At the request of the ALJ, a vocational expert attended and testified at the hearing. After reviewing the Plaintiff's file and hearing her testimony, the vocational expert testified that Plaintiff's work as an electrician's helper would qualify as medium and semi-skilled work; her work in the restaurant industry would qualify as medium to light skilled work; her work as a pharmacy technician, a cashier, and a photo technician would qualify as light and semi-skilled; and the job she performed in the receiving department at K-Mart would qualify as medium and semi-skilled, as those terms are defined by the *Dictionary of Occupational Titles* ("DOT"). *Id*. **at 364-65.**

The ALJ then asked the vocational expert if the Plaintiff would be able to perform any of her past relevant work activities if it was assumed that the Plaintiff would be limited to occasionally lifting 20 pounds, frequently lifting 10 pounds, but only from a bench level; that she could perform occasional postural activities such as bending, stooping, and

crouching; that she needed a variation of tasks that would enable her to move around or a job allowing for a sit/stand option of 30 minutes in each position; and that she could occasionally use a ladder. *Id*. **at 365-66.** The vocational expert testified that the Plaintiff could perform all of her past relevant work except for that as an electrician's helper or in a receiving department unloading trucks. *Id*. **at 366-67.** The ALJ then asked the vocational expert to assume all of the above limitations and the additional limitations that the Plaintiff's pain is always at a level five, that it becomes worse from there, and the pain is moderate on a constant basis. *Id*. **at 367.** The vocational expert testified that, assuming the degree of pain the Plaintiff suffered and the fact that she would require a job that afforded a sit/stand option, the Plaintiff would be able to perform unskilled, sedentary jobs such as an unskilled cashier position (approximately 70 of these jobs existing locally and 145,000 in the national economy); a parking lot attendant (approximately 80 of these jobs existing in the Asheville area and 85,000 in the national economy), a packer or packager (approximately 10 jobs at the local level, 25,000 in the national economy); assembly work (40 jobs locally and 102,728 in the national economy); and soldering (10 in the local economy and 53,750 in the national economy). *Id*. **at 369-71.** The

Plaintiff's attorney asked the vocational expert if there would be work the Plaintiff could perform given the above assumptions and the further assumptions that the Plaintiff had additional limitations of being unable to meet competitive standards to maintain attention for two hour segments, complete a normal workday without psychologically based symptoms interrupting or without unreasonable number and length of rest breaks, accepting instructions and responding to criticism from supervisors or deal with normal work stress or the stress of semi-skilled or skilled work. The vocational expert testified that there would be no work available to an individual with this degree of limitation and that they would be unemployable in any occupation. *Id*. **at 374-75.**

A review of Plaintiff's extensive medical history as contained in the record is as follows. She was seen at McLaren Regional Medical Center in Flint, Michigan, on October 29, 1997, with complaints of depression and suicidal thoughts. *Id*. **at 231.** She was transferred to Lapeer Regional Hospital for further evaluation and treatment. *Id*. **at 232.** She was discharged from that facility on November 2, 1997, and instructed to make an appointment with a psychiatrist and psychotherapist. *Id*. **at 236.** She was also prescribed the medications Zoloft and Depakote. *Id*.

On April 12, 2002, Lori A. Brandon, Ph.D., a psychological consultant with Disability Determination Services ("DDS") in Raleigh, North Carolina,[2] reviewed the Plaintiff's medical records and determined that she suffered from a recurrent major depressive disorder of moderate severity along with alcohol and cocaine abuse.  *Id*. **at 132, 137, 142.**  Dr. Brandon stated that these impairments resulted in the Plaintiff having mild limitations in the restriction of activities of daily living and in maintaining social functioning and a moderate limitation in maintaining concentration, persistence or pace.  *Id*. **at 144.**  Dr. Brandon also completed a mental residual functional capacity assessment in which she opined that based on the Plaintiff's impairments of depression and alcohol/drug abuse, she was only moderately limited in her ability to understand and remember detailed instructions, her ability to carry out detailed instructions, her ability to maintain attention and concentration for extended periods, her ability to complete a normal workday and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, and in her

---

[2] This agency provides disability evaluation services for the Social Security Administration.  ***See* Tr. at 223.**

ability to respond appropriately to changes in the work setting.  *Id*. at 148-49.  Dr. Brandon further noted that the Plaintiff could perform simple, routine, repetitive tasks.  *Id*. at 150.

The Plaintiff was seen at the Smoky Mountain Counseling Center for the period September 2001 through August 2003.  *Id*. at 158-73.  On October 11, 2001, the Plaintiff had an initial psychiatric evaluation with Dr. Mark E. Lawrence.  *Id*. at 170.  Dr. Lawrence diagnosed the Plaintiff as suffering from a major depressive disorder, recurrent and moderate; however, he noted that his diagnosis was "provisional given the fact that [the Plaintiff] is an active drug user [cocaine]."  *Id*. at 171.  The Plaintiff was prescribed Zoloft and directed to see her substance abuse counselor in a week and was to return in three weeks for "medication re-evaluation."  *Id*. She next saw Dr. Lawrence on January 28, 2002; he reported that she was "doing quite well" on Zoloft and he recommended she continue taking the medication.  *Id*. at 169.  A month later on February 26, 2002, the Plaintiff reported to Dr. Lawrence that she had experienced an episode of suicidal ideation the weekend before and complained that she was feeling depressed and suicidal.  She admitted she was able to relieve these feelings by using alcohol and cocaine.  *Id*. at 167.  Dr. Lawrence noted that

the Plaintiff was an "unreliable historian" but the only thing that "seem[ed]

clear [was] that she continu[ed] to use alcohol and drugs and has

attempted to deny their use in the face of strong evidence to the contrary."

*Id*.  In view of her past diagnosis of bipolar disorder, Dr. Lawrence

prescribed laboratory work for a "pre-lithium workup" to treat such disorder

and increased her Zoloft to 150 mg. a day.  *Id*.  He also recommended "a

more aggressive approach to her substance abuse treatment at this point.

This certainly compounds her problems if indeed it's not her ultimate

underlying problem."  *Id*.  The next entry in the record by Dr. Lawrence is

dated May 20, 2002, at which time he found the Plaintiff to be "quite

pleasant and cheerful."  *Id*. **at 166.**  He stated that the Plaintiff advised the

Zoloft was working extremely well for her, she denied any "vegetative signs

of depression," and she was quite satisfied with her treatment to that point.

*Id*.  She was to return in three months.  Dr. Lawrence's last report

contained in the record is dated July 8, 2002, in which he reported that the

Plaintiff continued to do well on 150 mg. a day of Zoloft, she denied any

mood instability, denied any vegetative signs of depression, and showed

no evidence of mania or hypomania.  *Id*. **at 165.**

On June 11, 2003, the Plaintiff underwent an MRI of her lumbar spine at Haywood Regional Medical Center. *Id*. **at 153.** Dr. Nila Wilbur reported that the results revealed "anterior displacement of L5 on S1 with mild narrowing of the foramina.[3] No evidence of impingement on the thecal sac. There is suggestion of pars defect at that level. Very mild disc bulge at L4-5. Examination is otherwise unremarkable." *Id*. **at 153-54 (footnote added).**

On June 30, 2003, the Plaintiff was examined by Dr. R. Mark Hazel at the Southern Ortho and Musculosketal Association and x-rays of the Plaintiff's lumbosacral spine were taken. *Id*. **at 157.** It was Dr. Hazel's diagnosis that the Plaintiff suffered from lumbar spondylosis[4] with right lower extremity involvement; Dr. Hazel prescribed a "medrol dose pack" along with home exercises and physical therapy. *Id*. The Plaintiff was to have returned for a follow up visit with Dr. Hazel, but the medical record reveals she failed to keep two other scheduled appointments. *Id*.

---

[3] "[A] natural opening or passage . . . into or through a bone." ***Dorland's Illustrated Medical Dictionary* 649 (28th ed. 1994).**

[4] "[D]egenerative joint disease affecting the lumbar vertebrae and intervertebral disks, causing pain and stiffness, sometimes with sciatic radiation due to nerve root pressure by associated protruding disks[.]" ***Dorland's, supra*, at 1564.**

The record also contains medical records dated May 19 to December 16, 2003, and June 11, 2004, to January 3, 2006, from Toxaway Health Center where the Plaintiff was seen by Dr. James R. Buehler.  *Id*. **at 174-90; 243-48; 270-80.**  On May 29, 2003, the Plaintiff saw Dr. Buehler complaining of low back pain and numbness and burning in both legs**.  *Id*. at 188.**  Dr. Buehler examined the Plaintiff and found her to have tenderness on both sides of her lumbar spine, but she had normal range of motion in both her upper and lower extremities.  *Id*. **at 181.**  He also ordered the Plaintiff to have an MRI.  *Id*.  She returned to see Dr. Buehler on June 16, 2003, to receive the results of her MRI.  *Id*. **at 179.**  He advised that the MRI showed spondylosis with myelopathy[5] and also diagnosed her as suffering from hypothyroidism[6] for which he prescribed Synthroid.  *Id*.  At her visit on August 1, 2003, she complained of sporadic episodes of sweating, low back pain, and an improvement in her mood swings as a result of medication.  *Id*. **at 188.**  Dr. Buehler diagnosed the Plaintiff as suffering from spondylosis and depression.  *Id*.  She returned to

---

[5] "[A] general term denoting . . . changes in the spinal cord."  ***Dorland's, supra,* at 1090.**

[6] "Deficiency of thyroid activity."  ***Dorland's, supra,* at 811.**

see Dr. Buehler again just two weeks later complaining that her back pain had worsened and radiated into her hip.  *Id*. **at 187.**  Dr. Buehler arranged for the Plaintiff to have physical therapy.  *Id*.  She returned for another office visit on September 16, 2003, at which time Dr. Buehler did laboratory testing of Plaintiff's blood and diagnosed her as suffering from excess sweating and hyperthyroidism.[7]  *Id*. **at 186.**  Two days later, she returned to see Dr. Buehler and received her laboratory results.  *Id*. **at 185.**  The results showed that the Plaintiff's cholesterol and triglyceride levels were abnormally high; Dr. Buehler diagnosed the Plaintiff as suffering from hyperlipidemia[8] and hypothyroidism and added the prescription Lipitor.  *Id*. On her visit of December 16, 2003, she reported to Dr. Buehler that her symptoms had been improving on the medications, including her depression, but that she was still suffering from low back pain that radiated into her hip.  *Id*. **at 184.**

---

[7] "A condition caused by excessive production of iodinated thyroid hormones and marked by . . . excessive sweating."  ***Dorland's, supra,* at 802.**

[8] Elevated concentration of lipids in the blood, *i.e.*, cholesterol. ***Dorland's, supra*, at 795.**

On September 9, 2003, Dr. Edward Woods, DDS medical consultant, completed a physical residual functional capacity assessment based on a review of the Plaintiff's medical records. *Id*. at 191. He was of the opinion that the Plaintiff could lift and/or carry 50 pounds occasionally, 25 pounds frequently; that she could stand/walk and sit (with normal breaks) about 6 hours out of an 8-hour workday; that she was not limited in her ability to push/pull; and she had no postural, manipulative, visual, communicative, or environmental limitations. *Id*. at 192-98.

On October 2, 2003, the Plaintiff was seen by Elizabeth Tulou, M.A., for a psychological evaluation. *Id*. at 201. It was her impression that the Plaintiff suffered from major depressive disorder of a mild nature and that her alcohol and cocaine abuse were in sustained, full remission. *Id*. at 204. Ms. Tulou also concluded that Plaintiff was able to "perform simple, routine, repetitive tasks as long as they do not require the use of her back. . . . No problems were mentioned about relational problems with her supervisors and co-workers. She says she gets along well with others." *Id*.

On October 28, 2003, Lavonne Fox, Psy.D., a DDS consultant, completed a mental residual functional capacity assessment of the Plaintiff.

***Id*. at 219.** Based on the Plaintiff's impairments of major depressive disorder of a mild nature and Plaintiff's past substance abuse, Dr. Fox opined that the Plaintiff was moderately limited in her ability to understand and remember detailed instructions, her ability to carry out detailed instructions, her ability to maintain attention and concentration for extended periods, her ability to respond appropriately to changes in the work setting, and in her ability to set realistic goals or make plans independently of others. ***Id*. at 219-20.**

On November 25, 2003, the Plaintiff was seen at the Shepherd Center in Atlanta, Georgia, by Dr. Gerald S. Bilsky. ***Id*. at 224-27.** After examination and review of the Plaintiff's imaging studies, Dr. Bilsky diagnosed the Plaintiff as suffering with "grade 1 spondylolisthesis and some degenerative changes." ***Id*. at 225.** He further noted that she would benefit from "physical therapy to work on some stretching and stabilizing exercises." ***Id*.

The next medical record from Dr. Buehler documents the Plaintiff's visit on June 11, 2004, where she was seen for blood testing. ***Id*. at 243.** On June 18, 2004, and August 3, 2004, she saw Dr. Buehler for contact dermatitis and an ear infection. ***Id*. at 244-47.** Almost a year passed

before the Plaintiff saw Dr. Buehler again.  On May 9, 2005, Dr. Buehler

reviewed the Plaintiff's medications and had a "long discussion [with her]

regarding disability." *Id*. **at 270.**  Dr. Buehler also completed a physical

residual functional capacity questionnaire in which he stated that, based on

his examinations and the results of medical tests performed, the Plaintiff

suffered from spondylosis, low back pain which radiated down her legs,

hyperthyroidism, irritable bowel syndrome, and depression.  *Id*. **at 238.**  He

advised that the Plaintiff's impairments had lasted and would be expected

to last at least twelve months; that the psychological factors of depression,

anxiety, and her physical condition contributed to the severity of her

impairments; that she constantly experienced pain that was severe enough

to interfere with her attention and concentration; that she had a marked

limitation in her ability to deal with work stress; that she could only walk

one block without rest; that she was limited to sitting and standing

continuously for only twenty minutes; that she was limited to sitting and

standing for only two hours out of an 8-hour workday; that she needed to

have periods of walking around every 20 minutes during an 8-hour workday

and that such periods should last at least 15 minutes; that she needed a

job where it would be permitted to shift at will from a sitting, standing, or

walking position; that the Plaintiff would need to take unscheduled breaks every 20 or 30 minutes during an 8-hour workday and such breaks would have to be at least 15 minutes in duration; that she could not sit for prolonged periods at all; that if she had a sedentary job, her legs should be elevated at least 50 percent of the time; that she could only lift and carry 10 pounds occasionally; that she had significant limitation in her ability to do repetitive reaching, handling and/or fingering; that she could not bend and twist at the waist; that the Plaintiff's impairments would cause her to miss work more than three times a month; and that she should not work in overstressed environments, extreme temperatures, or damp areas. *Id*. at **238-42.**

On June 17, 2005, the Plaintiff was seen in consultation by Karen Marcus, Psy.D., for a psychological examination. *Id*. at 250. Dr. Marcus reviewed the Plaintiff's medical history as well as performed a clinical interview and administered the Wechsler Adult Intelligence Scale-III and Minnesota Multiphasic Personality Inventory-2 ("MMPI-2") assessments. *Id*. Based on her clinical observation and the results of these assessments, Dr. Marcus concluded:

> Results of the cognitive testing find that [the Plaintiff's] cognitive abilities measured in the Low Average range. . . .

> What stands out most about the cognitive testing was [the Plaintiff's] quickness in her responses. This seems to imply that her thinking process is rather rapid, at least at times. She is also impulsive. Thus, at times she fails to think through things and use her resources. . . . [H]er personality style is such that she will tend to give up easily, especially when things become more difficult, or in tasks in which she does not excel. Thus, in spite of her cognitive capabilities, these things will create problems for her.
>
> . . .
>
> Findings of the MMPI-2 supported a diagnosis of Bipolar Disorder. Additionally, the drawings indicated personality features as such, including problems with reality perception. [The test] also indicated that her problems may be significant but not necessarily blatantly apparent. It also seems that [the Plaintiff] is more accepting of her medical problems rather than addressing psychological issues. This characteristic seems to warrant a diagnosis of Undifferentiated Somatization Disorder.

*Id*. **at 256.** It was Dr. Marcus' opinion that the Plaintiff could benefit from mental health treatment which should include psychotherapy to address "her coping and management of affect as well as the consideration of appropriate mediation consultation. . . . [The Plaintiff] demonstrates the cognitive capacity to manage her resources if she is awarded benefits. . . . It would be motivating for her if she is made aware that she is expected to make improvement with treatment and that disability should not be a permanent situation." *Id*. **at 257.**

In July 2005, the Plaintiff saw Dr. Buehler complaining of left knee pain; after an MRI, Dr. Buehler diagnosed the Plaintiff as suffering from a

left knee sprain and referred the Plaintiff to Dr. Herbert K. Plauche, an orthopedist.  *Id*. **at 272.**

Dr. Plauche examined the Plaintiff on July 26, 2005, and diagnosed her as suffering a probable medial meniscus tear in her left knee.  *Id*. **at 282.**  He prescribed her Celebrex and she was to return in two weeks.  *Id*. On her return visit on August 9, 2005, Dr. Plauche and the Plaintiff determined that surgery would be the most effective treatment of her knee pain.  *Id*. **at 287.**  She underwent arthroscopic surgery on her left knee on September 22, 2005.  *Id*. **at 289; 264-68.**  Plaintiff made follow-up visits to Dr. Plauche on September 28 and October 19, 2005; on December 28, 2005, Dr. Plauche noted that the Plaintiff had made excellent progress in her recovery, that she had full range of motion of her knee, no pain associated therewith, and she was to return to the clinic as needed.  *Id*. **at 292-94.**

On January 3, 2006, the Plaintiff saw Dr. Buehler for abdominal pain; he diagnosed her as suffering from gastritis and prescribed Citrucel and Protonix.  *Id*. **at 279-80.**

## IV.  DISCUSSION

Disability under the Social Security Act means the inability to engage in any substantial gainful activity due to a physical or mental impairment expected to result in death or to last for a continuous period of not less than twelve months.  In determining whether or not a claimant is disabled, the ALJ follows a five-step sequential process.  ***See*, 20 C.F.R. § 416.920.** If the claimant's case fails at any step, the ALJ does not go any further and benefits are denied.  ***Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995).**

First, if the claimant is engaged in substantial gainful activity, the application is denied regardless of the medical condition, age, education, or work experience of the applicant.  ***Id*.**  Second, the applicant must show a severe impairment.  If the applicant does not show any impairment or combination thereof which significantly limits the physical or mental ability to perform work activities, then no severe impairment is shown and the applicant is not disabled.  ***Id*.**  Third, if the impairment meets or equals one of the listed impairments of Appendix 1, Subpart P, Regulation 4, the applicant is disabled regardless of age, education or work experience.  ***Id*.** Fourth, if the impairment does not meet the criteria above but is still a severe impairment, then the ALJ reviews the claimant's residual functional

capacity and the physical and mental demands of work done in the past.  If

the claimant can still perform that work, then a finding of not disabled is

mandated.  *Id.*  Fifth, if the claimant has a severe impairment but cannot

perform past relevant work, then the ALJ will consider whether the

applicant's residual functional capacity, age, education, and past work

experience enable the performance of other work.  If so, then the claimant

is not disabled.  *Id.*  In this case, the ALJ's determination was made at the

fifth step.  "Considering the claimant's age, education, work experience,

and residual functional capacity [for only unskilled work], there are jobs that

exist in significant numbers in the national economy that the claimant can

perform."  **Tr.,** *supra***, at 35.**  The ALJ, therefore, found that the "claimant

has not been under a 'disability,' as defined in the Social Security Act, from

May 25, 2003 through the date of this decision [August 22, 2006]" and was

not entitled to a period of disability and to disability insurance benefits

under §§ 261(i) and 223(d), or supplemental security income under §

1614(a)(3)(A) of the Social Security Act.  *Id*. **at 37.**

The Plaintiff contends that the hypothetical question propounded to

the vocational expert at the hearing was inaccurate and incomplete.  "The

burden of proof and production rests on the claimant during the first four

steps, but shifts to the Commissioner on the fifth step." ***Burch v. Apfel*, 9 F. App'x 255, 257 (4th Cir. 2001) (citing *Pass v. Chater, supra*).** As noted, Plaintiff carried her burden of proof on the first four steps and the ALJ so found by proceeding to the fifth step where the burden then shifted to the Commissioner. "In questioning a vocational expert in a social security disability insurance hearing, the ALJ must propound hypothetical questions to the expert that are based upon a consideration of all relevant evidence of record on the claimant's impairment." ***English v. Shalala*, 10 F.3d 1080, 1085 (4th Cir. 1993).** These questions must fairly set forth all of the claimant's impairments. ***Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989).**

It is important to note that the vocational expert was present during the entire hearing, she listened to the Plaintiff's testimony, and had previously reviewed the Plaintiff's file. The vocational expert accurately described the Plaintiff's prior work experience. **Tr., *supra*, at 364.** The ALJ then asked the vocational expert a segmented series of specific hypothetical questions that correctly reflected the Plaintiff's limitations and her ability to perform any or all of her past jobs. ***Id*. at 365-74.** While the hypothetical questions could not be considered model, they were obviously

understood by the vocational expert as well as the ALJ. The questions clearly and fairly set forth all of the claimant's impairments found by the ALJ to be supported by the credible evidence. ***Walker, supra***; ***Hays v. Sullivan, supra* (holding the ALJ makes findings of fact and resolves conflicts arising from the evidence).**

In her questions to the vocational expert, the ALJ took into account numerous impairments indicated by the opinions of the various medical professionals who had examined the Plaintiff. She also discounted, at least in part, the opinions of Dr. Buehler, Plaintiff's treating physician, and those of Dr. Marcus. ***See* Tr. at 30-35.** The ALJ also set forth in detail why their opinions were not conclusive in her determinations that Plaintiff was incapable of performing past relevant work but "capable of making a successful adjustment to other work that exists in significant numbers in the national economy." ***Id*. at 36.** "[A] hypothetical question is unimpeachable if it '*adequately reflect[s]*' a residual functional capacity for which the ALJ had sufficient evidence." ***Fisher v. Barnhart*, 181 F. App'x 359, 364 (4ᵗʰ Cir. 2006) (quoting *Johnson v. Barnhart*, 434 F.3d 650, 659 (4ᵗʰ Cir. 2005)).** Although segmented, the questions, taken as a whole, were accurate and sufficient to satisfy the requirements of a proper

hypothetical question.  *See* **42 U.S.C. §§ 405(g), 1383(c)(3); *Richardson v. Perales, supra*.**

The Plaintiff also contends that the ALJ did not assign proper weight or interpretation to various named medical doctors or psychologists.  Such arguments are unpersuasive in view of the ALJ's reasoned and detailed consideration of the testimony of the various experts.  *See* **Tr. at 26-36.** Where expert opinions, such as medical professionals, are inconsistent or in conflict, the ALJ may decide whom to believe and to what extent so long as a proper reason is given for the decision.  ***Knox v. Barnhart*, 60 F. App'x 374 (3d Cir. 2003).**

It is also worth noting the degree to which the medical and psychological evaluations are dependant on the reliability of the Plaintiff's subjective rationalizations and assertions.  The ALJ properly made these credibility determinations in reaching her decision.  In addition, the ALJ had the unique opportunity of observing the Plaintiff's demeanor and considering the degree to which her subjective complaints of pain were or were not supported by competent evidence.  ***See, Shively v. Heckler, supra.***

Briefly, it is clear from the ALJ's decision that she considered Plaintiff's testimony regarding her pain and its limiting effects in reaching her decision.  **See, e.g., Tr. at 24-26.**  Plaintiff's testimony regarding severe limitations, however, were unsupported by the medical documentation contained in the record.  The ALJ determined that, in the face of such conflict, she would give greater credence to the medical records.  She also determined that the record contained sufficient evidence from which to form an opinion in general and, more specifically, an opinion that the Plaintiff was not disabled.  The Court agrees that sufficient evidence existed, and it is not for this Court to re-weigh such evidence nor to make credibility determinations regarding Plaintiff and her testimony.  Such decisions are for the ALJ.  **Harrison v. Comm'r of Social Sec. Admin., 201 F.3d 436 (table), 1999 WL 991418 (4th Cir. 1999); Johnson v. Barnhart, supra.**

Having reviewed the ALJ's decision and the entirety of the record, the Court finds such decision was reached by application of the correct legal standard and was supported by substantial evidence.  **Craig, 76 F.3d at 589.**  The decision will, therefore, be affirmed.

## V.  ORDER

**IT IS, THEREFORE, ORDERED** that the Plaintiff's motion for

summary judgment is hereby **DENIED** and the Defendant's motion for

summary judgment is hereby **GRANTED**.  A Judgment affirming the

Commissioner's decision and dismissing this action is filed herewith.

Signed: February 6, 2008

Lacy H. Thornburg
United States District Judge